The next case for argument is 14-159, Nuance Communications v. ABBYY Software House. Everybody's getting settled. Miss Maynard, whenever you're ready. May it please the Court, Deanne Maynard for Appellant Nuance. The district court erroneously construed identifying and recognizing by relying solely on a definition from a general purpose dictionary that's contradicted by the specification. That requires reversal. The specification explicitly teaches that identifying and recognizing a character can be less than unequivocal. Specifically... Is that the construction that your client proposed right off in the Markman? It's not, is it? At the initial Markman, Your Honor, we proposed plain meaning. And at that time, ABBYY agreed that the ordinary meaning of identify included an ambiguous identification. ABBYY's initial plain construction brief said many times an identified character is still ambiguous. So the question here is whether you're stuck with ordinary meaning since you agreed to that at the initial plain construction. The question is, is it error for the district court to look to a general purpose dictionary for ordinary meaning? It is in this situation. Two points about that, Judge Dyke. One, the ordinary meaning, of course, in patents is the ordinary meaning as understood by a person of skill in the art. Here this is one of the ordinary meanings of identify, but you must look to the patent specifications to determine the ordinary meaning. So if you were to say... In that instance, if that's your argument, and that's a plain construction argument that should have been raised in the first instance in the Markman proceeding, right? If you're saying, no, it's not ordinary meaning in general, it's ordinary meaning in light of the specification and therefore it includes the ambiguous stuff, then that should have been raised at the Markman. It's something that was conclusively determined at the Markman, but it wasn't. You were stuck with ordinary meaning, right? This is one of the ordinary meanings. What we're speaking is one of the ordinary meanings, Chief Judge Gross. At the time of the Markman, it was common ground between the parties that an identified character could be ambiguous. That's the introduction to Abbey's plain construction brief on A-537. The dispute arose about which ordinary meaning it was at summary judgment. How was the jury instructed? Where do we find the jury instruction? The jury was told it means... Where? The jury instruction, Judge Dice, appears on A-3452. And it says, the terms identifying and recognizing, this is line five, each has the same plain and to establish the identity of. Okay, so how does that preclude your interpretation? Because it doesn't make clear that the scope of identify includes non-final identification. Yeah, but it doesn't preclude that, right? Is that correct? We think it does, Your Honor, because... Well, the judge allows you to argue for your interpretation at the trial, right? This is a question that... Is that correct? Yes, Your Honor, but that can't save the error. Under O2 Micro, that was the case as well. The parties argued their different constructions to the jury, but this court held, it's a Markman question. It's a question for the judge. The fiscal dispute arose at summary judgment when both parties briefed claim construction, the meaning of identify. But you never proposed. If we buy your argument that it is a matter for claim construction, you never proposed that it includes explicitly to say that identifying includes non-final identification. Yes, Your Honor. Yes, you did? Yes, we did, Your Honor. At A1436 is the briefing on the supplemental briefing. So the court reopened claim construction. When we raised this issue, the court reopened claim construction, allowed the parties to brief what they thought the ordinary meaning of it was. And at A1436, we asked for identifying for in, finally or tentatively, or in the alternative to Judge Crose, identifying has its plain and ordinary meaning. Many times an identified character is still ambiguous. That was straight from Abby's first claim construction briefing. I don't understand how you can argue that the instruction that the court gave to the jury precludes that view of what ordinary meaning means. To finally establish the identity, maybe you'd have an argument. But it doesn't seem to me that the instruction he gave precluded you from arguing that a tentative or preliminary identification would qualify. And indeed, you did argue that to the jury, and the jury rejected it. Your Honor, to establish the identity of suggests a definitive determination that is inconsistent with the specification. That's the definition that Abby requested. That's the definition they got. The error that the judge made was not resolving this claim construction dispute between the parties, which was, does the ordinary meaning of identify in this patent include one that don't finally establish the identity of? Why couldn't it be a fact question? Whether a system that performs ambiguous identification, tentative identification, it's a fact question whether that meets the limitation of identifying, or to establish the identity of. Because it's a question about the claim construction question, whether ambiguous identification is encompassed by the word. It sounds also like a fact question. Both parties understood it, Judge Chan, as a claim construction question. In the summary judgment briefing, both parties briefed it as a claim construction question. I don't understand. If there was a claim construction, you were satisfied coming out of claim construction with a plain and ordinary meaning. So was it your view that no one could construe the plain and ordinary meaning to be something other than includes the non-final identifiers, the ambiguous identifiers? The dispute at claim construction was about something else, Chief Judge Crowes. The parties agreed then that it included tentative. When Abby suggested at summary judgment that it excluded tentative identifications, which that is their argument in the summary judgment papers at A943, they give definitions of identify, and they say under their definitions, they don't infringe and they're entitled to summary judgment. We replied, Judge Chan, in claim construction argument, saying no, you can't. That's inconsistent with the language of the specification. This is a scope issue. It's a claim construction issue that under Markman, the jury would have benefited from an explanation of what the boundaries of our claim is. It ultimately is what... I guess the question is, the district court, I don't think, erred in saying that it wasn't going to reopen claim construction after it decided to go with plain and ordinary meaning, which is what you urged at the Markman. So maybe what the district court did wasn't necessarily a claim construction on the Evers trial, but instead, once everyone agreed to go with plain meaning, now what that means is the patent doesn't really matter anymore. Now it's just the jurors' understanding, their own experiential understanding of the word identify that matters, and so you don't necessarily have to engage in a review of the intrinsic evidence anymore. What do you think? No, I disagree with you on almost everything you just said. First, the district court did reopen claim construction. Initially it had construed identify as identified. It reopened claim construction and it adopted Abby's construction, which is to establish the identity of, and rejected our construction, which was identifying, finally or tentatively. So suppose the district court had instructed the jury that this term should be given its plain and ordinary meaning and hadn't given them any guidance. Would you have a complaint about that? Yes, Judge Dyke. This dispute about the scope of the plain and ordinary meaning arose right before, in summary judgment, in plenty of time to resolve, more than a month before trial. Yeah, but I think what's the problem? The problem with Judge Chen identified, there's a murky line between claim construction and infringement. I mean, I suppose if you get really detailed in the claim construction so that every infringement question would become a claim construction question. But there has to be some sort of gray area between the two where something can properly be treated as a question of infringement rather than claim construction, which seems to be what the district court did here. No? This is plainly on the side of claim construction, Judge Dyke, and both parties saw it that way. So if I could call this, so I thought you said to Judge Chen, if at the end of the day you proposed plain and ordinary meaning and you came up to the judge afterwards and said, can you reopen Markman because we want more clarity than plain and ordinary meaning, I thought you would agree that that wouldn't be reversible error on the part of the district court judge to say, no, we're not reopening it. Yes, it would be. Under O2micro. Absolutely, Chief Judge Crouse. O2micro says, a dispute about the scope of a claim term arose before trial in time for the judge to fix it. Here was plenty of time. It was five weeks before trial. This is really ultimately a jury instruction question, and it was it's a Markman question, and it's the court's duty to resolve it. And Judge Dyke, this is way on the side of claim construction. Both parties briefed it that way in the summary judgment motion. That's why we went back to the court when the court didn't resolve it on summary judgment and just didn't give any explanation. The parties had each briefed claim construction issues in the summary judgment. And we said, a dispute has arisen of claim construction that we need your guidance for the jury. We asked for it to be construed. He did reconstrue it, and he construed it incorrectly. There's no way to read column 20 of this patent without concluding that identification here includes recognizing a character by a group of characters that it belongs to and not definitively... I don't know if we... We're outside the game of what an intrinsic evidence is as soon as there's an agreement about plain and ordinary meaning. But I guess your position is once the district court adopted plain and ordinary meaning, it was your understanding that all parties understood that to necessarily encompass ambiguous identification. Absolutely. And so therefore, when in your view, the other side at a late stage said, no, it doesn't include ambiguous identification, you're saying, okay, now the playing field has completely changed. And at this late stage, we need resolution because of this switch in position by the other party. That's right, Judge Chin. Abbey changed its position about what the plain meaning of identify means by saying it means establishing finally the character. But did the district court ever say when I say plain and ordinary meaning here at the Markman order, what that encompasses is ambiguous identification? No, Your Honor. It doesn't sound like the most natural common understanding of the word identify. It is. So if you got on the elevator this morning in the courthouse and you recognized the other I recognize that law clerk. You've identified that law clerk. You just don't know precisely who it is. And that's exactly the way the patent uses identify and recognize. You identify someone by a group or a class in which it applies. Could I ask my colleagues to have more questions about the plaintiff's section? Could I bring you to this other question of whether you were entitled to a second trial? I've looked at the special master's report and particularly 691 and it strikes me that special master is saying recognizes that there's a dispute about whether there should be more than one trial and says we're going to have a trial and sets forth the number of patents and the number of claims that can be brought up about the trial. Why doesn't that resolve the question that you're trying to argue in the brief? Because this was against the backdrop of many discussions about how to orderly proceed to trial in a way that would hopefully resolve the case with one trial. Correct. So wasn't that resolved in the special master report which was adopted by the district court? No, Your Honor, because in the order appointing the special master, as the special master's point said, she would submit the following report and recommendation on case management. And the district court had repeatedly, throughout the discussions about this case, drawn a distinction between the order in which we're going to present things to the trier of facts versus no nuance, I recognize, I can't take away your causes of action without resolving them. I don't understand your answer. The special master recommended and adopted by the judge, I don't think you put in any argument that you shouldn't adopt the special master recommendation. He says we recommend all parties proceed through discovery and mediation and then trial on both the first and the second group. And then from that he draws out that the numbers are going to be limited to a total of four patents and 15 claims. That covered trial on both patents, right? On all patents, right? Everything went to discovery up to expert discovery and then a subset of patents had to be picked for expert discovery and trial. But it was understood and no one ever said they can point to no statement in the record where either they or the district court said, once we have a trial on this subset of patents, that the rest of the patents are going to be dismissed with prejudice. Wait, but this contemplates a single trial, doesn't it? On page 691 in the special master's report. But the discussion's up to that. Wait, is that correct? Does it contemplate a single trial? Does it? Yes? Yes, Judge Sykes, but not only one trial. And the discussions before this had all contemplated that one trial might not be enough to resolve everything. Hopefully it would be. Hopefully if Nuance went to trial on its best patents, that it would come out in a way that that would end it. But I've read all of your side's statements and course of dealings leading up to the trial as yourself acknowledging and recognizing that there needed to be a winnowing process. And the most important thing to your side was to ensure that your side was able to get discovered on all the patents and all the various claims. But then ultimately, your side even wanted to go down to just three or four patents and ultimately urged four patents and 15 claims to the special master, which the special master adopted, right? No, Your Honor. What Nuance said. Am I wrong that Nuance recognized and made efforts to winnow down the case? Winnow it down, yes, to the extent that there were efforts to winnow down so there could be a first trial that would hopefully resolve everything. So if I could just quote. I guess what I don't know is, do you know of a case where the parties are working hard in a very complex case spanning several patents and dozens of claims, where they mutually winnow it down to a handful of claims? And then after that case is over, they say, okay, now that we still have non-selected claims, let's go on a second trial for that. Do you know of a case where that's happened? This is the only case I know of where a court has to submit separate causes of action without trying them when they were never abandoned. Well, why don't you, under the recommendation, you could have raised, asserted four patents at the trial and 15 claims. It's my understanding that you asserted three patents and seven claims. Why? If I'm right about that, why? If you had other good patents, why didn't you, if you had room for another patent, you had room for eight more claims. Why didn't they go in the first trial? We initially selected four patents, Chief Judge Frost, for that trial, and those four patents went through the six months of expert discovery, getting ready for trial. On the eve of trial, in order to winnow down the trial further, we dropped one, the 009 patent. But in that document, dropping that patent, we expressly reserved the right to try the other patents, the untried patents. Abby here has not made a distinction between the patents, but if the court were going to draw a distinction, one could draw a logical distinction between the 009 patents and the other untried patents. But if I could just point you to three documents that I think establish the understanding of the parties, up until the time of trial. The first is the document that you suggested, which is the court ordered Nuance to pick a subset of the patents for the trial. The special master report? The special master recommended it, and the court adopted that order yesterday. I don't see where in that, any support for the notion there was going to be a second trial. Where does he say there's going to be a second trial, or she say? That document does not mention a second trial, Judge Dyke, but in the course of dealings up until that point, the district court had made clear, and Nuance had repeatedly stated, that it thought, wanted to postpone the rest of the case, hopefully. Where did the district court ever say that there was going to be a second trial? The district court said, early on, things like this. In response to another defendant, who's not in the case anymore, who wanted to dismiss some of our patents with prejudice, the district court said, I can't do that. I can't just dismiss, they have separate causes. That's not responsive to my question. Where did the district court ever say there was going to be a second trial? The district court never promised a second trial, Judge Dyke, but the district court never said there's not going to be a separate trial. Well, except, isn't the language that Judge Dyke pointed into in the master's, special master's report talks about a trial on both the first group and the second group. If there were a trial that covered the first group and the second group, wouldn't that cover all the patents we're talking about here? No, Your Honor. So there are other patents beyond the first and second group? I think the first and second group encompass all of the patents. But the point was that there was going to be fact discovery on all the groups, and then forced selection of the four patents, and then expert discovery and trial on those patents. But it was your side that recommended four patents and 15 claims, right? For the first trial, Judge Chen. Well, that's not what the special master report says, because it says trial on both first and second groups followed, and then the next sentence deals with the total of four patents and however many claims. When we followed the order that resulted from the special master's report, we expressly stated we will postpone the other patents. We will go to trial on these patents. Where is that? That is at A727. Line five. Nuance maintained its allegations that defendants infringe the claims in assertive but unselected claims from all previously assertive patents and reserves its right to reassert them against Abby and her elect mark at a later time in this suit or a future suit. Abby never disputed this. Second thing, on January 4th. So you're saying that if a party says something that's contrary to a court order, that we go with the party's interpretation rather than the meaning of the court order? It's completely consistent with the court's order, Judge Dyke. The court's order says select four patents for the trial. It doesn't say select four patents for the only trial and that the remaining causes of action you have, which are separate and independent and cover separate inventions, will be dismissed with prejudice despite having been determined on the merits. Then there are two things past this that I would like to bring your attention to. One is after this, subsequently, before the trial, in two joint case management reports, things that Abby joined did not dispute but, in fact, it isn't even just Nuance's statement. It's a joint statement. One is on A740, line 24. Pursuant to the court's order at the request of defendants, Nuance has narrowed its case for expert discovery and trial by selecting a subset of claims for four of its eight assertive patents, and it names them. and claims that were not selected as part of Nuance's court-ordered selection. The next one is a joint pre-trial order, joint proposed pre-trial order, which is in the other volume of the data. A740 kind of stops short of saying that the parties agree that there's going to be a second trial, right? It's a clear statement of agreement between the parties, Judge Dyke, that this trial is not going to resolve the patents that are not being tried. This is not a situation like Pat's. There was no discussion that these are representative patents and the rest of the patents are going to be judged based on these. If this were a non-patent case and you had four separate causes of action and the court went to trial on two of them and then entered judgment on the other two without deciding the merit, that would clearly be reversible error. Where's your third one? My third one is on A1222 in the footnote. This is the place I was missing a Chief Judge's Prose right before the trial in order to narrow. I'm sorry, it's on A1222. It's in footnote one. And this is a joint submission by both parties, pre-trial, proposed pre-trial order, footnote one. This is where we say we're going to narrow out the O09. So that's where I was saying one could possibly draw a distinction. But the last sentence of the first paragraph in the footnote says, Nuance reserves all rights on previously asserted patents, claims, and causes of action that were not selected as part of Nuance's selection. So this is right before the trial. The first time Abby ever said that this judgment resolves our other patents, our untried patents, and that they were abandoned was in the cost motion after the trial. That's the first time that they ever asserted that. And the judge's order saying that he'd entered judgment on not resolved patents was the first time that had ever been said by the judge. The discussions before leading up to the special matters. But both of these stop shortly saying that we understand we're going to get a second trial, right? The first one that I pointed to, too, Judge Deck, where we name our... So on A727, the first one where we comply with the court's order to select the four. No, but I'm talking about the joint statement. The two joint statements. The joint statements don't say anything about a second trial, right? They don't. They don't. That's true. But they don't say anything about us abandoning our patents or that judgment. What happens here, Judge Deck, is judgment has been entered against us on untried patents. There's no precedent for that, except where there's been a showing, like in Katz, that they were representative. So I guess you're saying when all the parties, the special master and the district court, are collectively working together to winnow down a case down to a reasonable number of claims, the default should be that everyone is on notice that there's going to be a rematch after a trial on those selected claims? You wouldn't have to hold that as a broad principle here, because those aren't the facts. Here, leading up to it, the understanding was that NUANCE continually, repeatedly, reserved, expressed and reserved its rights, that the parties in joint statements after the selection said that NUANCE reserved its rights. When NUANCE chose the patents, NUANCE said it reserved the rights. And this is the language I was trying to point you to, Judge Deck, at page A727, to reassert them against Abby and her Lexmark at a later time in this suit or a future suit. So you wouldn't have to hold that. No, and here we're just talking about it would be like one more trial. Can I just say that? Assume hypothetically you've got a special master's report adopted by the district court judge that says you might want a second trial, you might want eight patents, this is what we're going to do. In that circumstance, however many documents you submitted joint or singularly that said we reserve our rights to a second trial would all be irrelevant, right? You don't get to reserve rights if the district court has decided, you know, I'm going to do this case this way. You don't get to reserve your rights to do something other than what he's directed, right? Perhaps, but if that's how you view this, that is reversible error. That is beyond the discretion of a district court judge to enter judgment on causes of action that are separate and independent and not relevant. The question is whether you've made and whether you've preserved this argument. In the special master's report, presumably there was briefing when that was approved by the district court. Was there briefing? There was some briefing after that, Your Honor. Before it was approved. Did you raise this question about a second trial in that briefing? Did you object to the special master's report on the ground that it contemplated only a single trial? It didn't contemplate only a single trial. But did you make the argument? No, because it didn't contemplate that. One couldn't read the course of dealings here to understand it that way. And if we did have to preserve it, we preserved it when we made this election on A727. We reserved the right to reassert them against Abby and her Lexmark at a later time in the future suit. They never disputed that. But Abby, the first time Abby said that the other claims had been resolved with prejudice was after the judgment. That's the first time they ever argued that or said it. They can't point to a single statement, a single clear statement from either the district court judge, which I don't think that select four patents for a trial is not such a statement, or from Abby, saying that the rest of the unresolved patents were going to be resolved with prejudice. In pretrial, you were all along fighting for a single trial, right, whereas the other side, Abby, was looking to have two-stage trials, one for the OCR and another one for the non-OCR patents. And you resisted that, and the special master and district court agreed with you that it would all get rolled up into a single trial, right? In the hope, Judge Chen, that it could all be resolved in one trial. But if I could quote you what I was trying to quote you earlier, like A421, there are other statements like this in the record. This is from Nuance. If you do that, in other words, if you let us go to trial on a subset of what we think are our strongest patents, either win or lose, that will typically resolve the whole dispute. In the meantime, the other patents, quote, would effectively be stayed. That's A422. Those were the conversations that, and it's consistent. If one reads the record, there were a lot of conversations back and forth, but it's consistent if one reads the record. The district court was talking about the difference between the case management and how to manage it in the hope that it would get resolved easily versus what it could do on the merits. More than once said it couldn't resolve. It would violate Nuance's due process rights to resolve its separate patent claims without patent causes of action, without actually determining them on the merits. So yes, did Nuance hope, Judge Chen, that one trial on the strongest patents would end this case, or that if all the patents went up through discovery, there might be summary judgment that would resolve it one way or the other? And at one place, Nuance's lawyer said, yes, maybe summary judgment of none for instance would be entered. And that would winnow the case down. Yes, that was the hope. And had we prevailed in the trial, which I think we would have if the claim construction had been correct, that might have been enough to resolve it all. But what's happened here is unprecedented. The judge has issued- Wait, you were talking about a package of eight patents. Is that true? Eight patents, yes. Eight patents. Okay. Somehow it got winnowed down to at least six before it went down to four, right? Am I mistaken about that? No, I mean, I think there's a lot of confusing discussion, Chief Judge Frost, in the dialogue. But there were patents selected for Markman, and there were different selections. Okay, so you went to trial on what you conceded, what you agree are your strongest patents. So your thought, everybody was assuming all along that if you won on those patents, then there wouldn't be a second trial. But if you lost, there would be? What was the thought process here? I'm not sure. That's essentially what Nuance's lawyer was suggesting. There were lots of dialogue, Chief Judge Frost. So you're saying, he was saying, if we win, we don't need a second trial? Typically, that would resolve the whole dispute. But what happened here is that we have a complaint that includes eight patents. Judgment's been entered on patents, which this course held, independent causes of action. There's no argument that what was tried is representative of these untried patents. And judgment's been entered against us on them without the merits being determined. What strikes me is there's a real risk of sandbagging here. You have an order from, a proposed order from the special master, which talks about one trial. And what you're saying is that because of some ambiguous statements that were made later on, that the district court can't give that report, it's plainly interpreted as barring a second trial. I mean, it seems to me that if you thought you wanted a second trial, you had the obligation to come to the district court and say, by agreeing to this, we're agreeing to what the scope of the first trial is going to be, and there will be a second trial if we want it on the remaining claims. And you never came to the district court and said, we want the order revised or supplemented to say that. Right? I don't know how much clearer we could have been, Judge Dike. In complying with that order to select, we said, NUANCE reserves its right to re-insert them. But that's the problem. In private practice, I saw lots of statements like that by lawyers about reserving rights to this or reserving rights to that. That doesn't become part of the court order. It doesn't change the court order. Why is it up to you to say to the court, your order is ambiguous or your order precludes us from doing this. Please change it and make clear that we're entitled to a second trial if we want it. And it seems to me that that never happened here at all. What we had is just some stray statements about reservation of rights. And it doesn't seem to me that that cuts it, that that fulfills your obligation to make a record about your claim that you're entitled to a second trial. That's the problem. When you put it, though, Judge Dike, against the backdrop of the discussions that occurred before the magistrate judge's order, ordering, I mean, I'm sorry, the judge's order ordering NUANCE to select the four patents, it was clear that the district court judge was just talking about the order of trying to resolve the case and hoping. So there are places where, like in the very first conference in February of 2010, Abbott's counsel proposed a procedure like one in Texas. And the court said where you construe some claims and you let the case proceed on those claims only. And the court says, is that without prejudice to any additional claims being litigated thereafter? And Abbott says, yes, yes, because, of course, you can't just dismiss claims and say you're done. And the court says, later on, says, I'm not going to do what the district court judge did in Texas, but I want you to come back having met and deferred on a way to narrow down the claims that are initially adjudicated. This is the conferences of AA365. And then in joint statements after that, all along, NUANCE talks about postponing resolutions, going to postpone its case, it's going to cooperate with the court to narrow the case, to put on the side burner other patents. That was the course of discussion all the way up that led to the special master's recommendation, which doesn't say there's only going to be one trial. It says we're going to have four patents selected for trial. It doesn't say the only trial. Given the course of dealing before that judge died, NUANCE was on no notice that it needed to come in and say, well, we just want to make clear this isn't going to be the only trial. We're going to litigate everything else. And to the extent we need to do that, we did do that because we say on A727 that we aren't giving up our patents. We don't have any intention to dismiss them. Okay. We're way behind our time, but that's not your fault. We'll give you back three minutes. I appreciate your questions. And we're obviously going to have to have some symmetry here, so why don't we add at least ten minutes to start with for the other side. Thank you. Don't feel compelled to use both of these. I hope I don't. I'd like to start where NUANCE left off. And especially I want to talk about NUANCE's understanding of its proposal in July 2011, which is what the special master adopted. I'm going to quote from the July 2010 case management hearing transcript at 475.76, and this is what NUANCE's counsel told the judge in July 2010. Quote, my concern is that having multiple trials could be very expensive. I would think that we could have a markman process, maybe have a subsequent markman process, and perhaps by then do summary judgments or whatever. We get to a manageable set for one trial. And Judge White responds to that at A478, and what Judge White tells NUANCE's lawyer is I'm not in favor of serial trials. I can tell you that that's a bad idea. In July 2011, NUANCE formally proposes this dual markman single trial procedure, A663-65, and if you compare that to the special master's chart, A699. Now, I understand, and we've looked at this. I think you can appreciate all of the various references. But how do you avoid there's no clear statement in the special master's report or otherwise. This is going to be the one and only trial, and this trial is going to take care of all of the asserted patents. And in the absence of that, what we've got are other statements that Mr. Maynard pointed us to where they clearly reserve their rights, clearly suggesting that at least one person here was not assuming that this was necessarily going to be the one and only trial. Well, I think the context, what I just discussed in what NUANCE's counsel told the judge, and then in combination with the dual markman single trial proposal and how NUANCE was going to select claims to window down, their conclusion from that, that they would always be able to assert these patents later on, makes no sense. And what I want to talk about is some of the, well, all of the things that they point to that say contradict Judge White's finding that NUANCE got exactly what it requested. And NUANCE's counsel pointed to some statements that were made at A421 and 422. Those statements were made in April 2010, three months before NUANCE came up with this dual markman single trial proposal. And in that April 2010 case management conference statement, NUANCE did propose two trials, no question about it. It proposed a phased case where it was able to choose the trials, but if you go to that transcript at 434 to 441, you'll see the parties in the court discussing that and Judge White expressing disfavor based on some bad experiences he had earlier on in his career, where the parties assured him that if he could only take care of inventorship, the rest of the case would go away. And he says, I'm not going to do that. And after that point, NUANCE never again raises a two trial proposal. NUANCE's counsel talked about Judge White's assurances that due process would be followed. Those statements are that the district court would allow NUANCE to keep all the patents it wanted in the case up until discovery closed. It would get markman on all the patents it wanted to get markman on. And then when it came time for trial, NUANCE, not the court, not the defendants, would be able to choose the patents that were going to go to trial. Can I ask you, and Judge White, somewhere in his conclusion, he said, considering the law, and he pointed to NUANCE's failure to mention in its post-trial motions or its notice of appeal, its potential request for a new trial. Why would that be necessary? Well, it goes to NUANCE's expectations. Well, why would they have to? I mean, they've got post-trial motions on what went down here. Why would necessarily there be discussion by NUANCE about a second trial? Well, there ought to be some discussion somewhere, whether it comes in the new trial or J-Ball motions or some other motion to sever. Well, that may be fair enough. They should have said something sooner rather than later. But the judge himself, whose opinion we're reviewing, points to NUANCE's failure to mention in the post-trial motions, as if he takes that as one factor, demonstrating that they never intended to, they really never contemplated that there would necessarily be a second trial. And I'm not understanding why that's compelling. Well, it doesn't necessarily have to be in that motion through that vehicle. But what Judge White is saying is that if they really expected a second trial after they lost the first one, I would have expected competent counsel, and there's no question NUANCE has excellent counsel here, that they would have alerted me somehow. For example, I issued a final judgment. Yeah, but that cuts against you, doesn't it? The suggestion that's in the judge's mind, he thought, well, maybe there was an opening, but they should have waited. Why does it matter? I mean, if his view was that they never ever, they gave up their rights voluntarily to ever have a second trial early on, at least after the special master's report, etc., then why does it matter whether they said something after trial or not, right away or a little later? I think it's corroborating. I understand, but by itself, maybe not. But Judge White was there in July 2010 when these proposals were being discussed. He's the only one among us that was there. And his primary finding at A23 is based on the July 2010 and July 2011, what was going on at the case at that time. And then I think he looks at the stuff leading up to trial and post-trial and says that's corroborating, that NUANCE knew all along, and this is just more evidence that NUANCE knew all along, that it wasn't until eight months after final judgment is entered that NUANCE finally comes forward and says, oh, no, no, no, no, we're ready for our second trial. Now, NUANCE has counseled, I'm sorry. Ms. Mayer points to these two joint pretrial orders, which have this ambiguous language about preserving rights. Why in heaven's name did you allow that ambiguous language to go in the pretrial orders? What did you understand that they were talking about there? Your Honor, the way these joint pretrial are set up is each side puts in their own part. It's not that we're sitting down and crafting figure one together, footnote one. They write the first paragraph of footnote one, rewrite the second paragraph of footnote one. Those reservations of rights, you commented on it earlier, those are reflexive statements of lawyers. If I were in your position, I would never have permitted that. Your Honor, if we fought every time somebody put in this reservation of rights language, we would never get done what the district court wants us to get done. When at the end of an expert report, at the end of a deposition, at the end of trial, everybody's always reserving rights that they don't have. And if we fought over that and bickered over that, the district court's work would just never get done. And so these statements appear all the time, and you just can't physically respond to all of them. But it cannot override. Well, it seems the clearest case we have on this in our precedent is the Emory Capp case. Correct. And it seems to me that what went down here is arguably clearly distinguishable from Capp's. As I understand, all Capp says is the judge was disallowing assertion of a million claims because he said it's all duplicative, there's nothing new here. And he gave them the ability to come back, and if they could show the district court judge that they weren't duplicative, that there was something different about those claims, then he'd rethink it. So that doesn't get you very far. It certainly doesn't get you very close to this case. I think that the procedure in this case was even more permissive than Capp's. Because Judge White didn't say it has to be duplicative. All he said was, and nobody disputes that there was this claim substitution procedure. The local rules of the Northern District of California can't have a good cause exception to the patent rules that allow you to amend your infringement contentions. All of these vehicles were available to nuance. On just the showing of good cause, it wasn't even specifically that it had to be. But they were capped at four, right? There was no way they could go beyond four. They could switch in and out. They proposed four. No, no, but just to answer my question. The schedule capped them at four. And they had eight. On the eve of the trial, they had eight patents. Two of them were dropped voluntarily before there was any order in place. What do you mean dropped voluntarily? From this trial as part of this, or dropped from the case? The 053 and 983 patents in May 2010 were not part of Nuance's original 24 claims that they selected. The 24 claims they proposed the 24 claims. Well, Ms. Varner is going to tell us because they were only talking about what they would put forward. Oh, that they anticipated they'd be able to assert them in a second case. I understand their position. But yes, the rules allowed them four patents, 15 claims. They leave one claim, or they leave eight claims and one patent on the table and never ask to substitute it. So it's hard for Nuance to assert any kind of prejudice here. When they leave these things behind and don't try to question it. Well, hypothetically, they had used up all four slots. They switched in and out, switched in and out, and they ultimately used 15 claims, which they were eroded, I think, for a patent. Okay. Would that be a different case from your perspective? Well, if the judge came up on his own without working with the parties on this plan, if Judge White had a standing order that said, no matter how many patents you bring to this case, you're only going to trial on four claims, 15 claims, four patents, and I'm not going to give you any opportunity to add more. I think that's a violation of this court's case management procedures that set out in the past. But here, like Judge Chen mentioned, this is a several-year process. So what is the difference here, because you're saying they voluntarily, everybody was in the same room and everybody voluntarily agreed to this? Yes. Yes. That Nuance, Judge White was very clear. His charge to the parties was narrow this case into something that we can trial. And you'll see statements from Nuance's own counsel, who knows they're not taking eight patents to the jury, that they're going to try and maximize Nuance's chances of success. And before there's any order, they've already indicated to the judge, we're really not going to go to trial on any more than three or four. And so when the parties are working together, and this is a voluntary process, Judge White didn't force anything at any time. Everything that was done here was done at Nuance's urging. But I guess Nuance is telling us that they understood the practicalities  But that doesn't necessarily preclude them from also feeling like there will be a second trial, where we can still go forward with the other patents. And that's where the July 2010 case management hearing comes in, which makes it clear, yes, they understand they're going to have to narrow their claim, and they're doing this in full light of their demand that there only be a single trial here. And Judge White responding, yes, serial trials are a bad idea. So everybody understands there's only going to be one trial. And in that context, Nuance is making this four-patent, 15-claim proposal. There is no other way to interpret those events, other than as Judge White interpreted those events. But even if there is a reasonable explanation otherwise that supports Nuance, in order to prevail on this, Nuance has to convince you that Judge White's interpretation as historical fact on what happened on this case is clearly erroneous. And they can't possibly show that on this record. Do you want to move forward? Yes. The history of the case is also very different from what Nuance argues on the claim construction. First, the district court didn't allow the parties to argue claim construction to the jury. Nuance has not— But let's go back to the argument about O2 micro. They say plain meaning, but if somebody wakes up and recognizes that the heart of this dispute, and what's going to determine likely infringement or non-infringement, is going to be this nuance in identification as to whether it allows ambiguity or not. They think there's their position, their more refined position, supported by the fact that you probably disagree with that. Why, when they call that to the attention of the district court judge, shouldn't he say, yeah, I better clean this up and do a markment because this case is going down on this claim construction point? Well, he's not going to reopen markment at this point. What he tells Nuance is, you told me plain and ordinary meaning, and we are going to trial on the plain and ordinary meaning. Now, if there's a dispute over plain and ordinary meaning, please, parties, come to me and help me craft a jury instruction so that I can help the jury understand, give them more guidance on what the plain and ordinary meaning is. And what he rejects is Nuance's attempt to put a gloss on the ordinary meaning of identify based on alleged inconsistencies in the specification. But he didn't reject—I mean, really? I mean, so he, in effect, he had—what he's saying is he had another markment, and he considered the much more refined, detailed definition, and he rejected it. So, aren't we supposed to review that, and shouldn't he—I mean— No, well, so he didn't—he told Nuance it's too late to do another markment, and so— Yeah, but that's what I'm asking you about O2 micro. Right. I mean, is that enough? I mean, if there's a claim construction dispute, and if, at least when we're looking at it, later on in the day, we conclude that that was dispositive of infringement, and therefore the district court was compelled to give us more than ordinary meaning, because it's a claim construction, not an infringement issue. Right. I mean, isn't it—so what if—isn't the answer—so what if he already construed it as a markment? Well, and that's true. If he didn't—I think, I mean, Nuance did suggest that he just tell the jury, give it its ordinary meaning. I don't think that would have—that would have been enough under O2 micro. But what he did was enough under O2 micro, because he provided a definition. Establish the identity. That's the ordinary meaning of identify. Now, Nuance says that that's inconsistent with how the term is used in the specification, but it's not. And Nuance, in order to make its point that it means something different, is they keep using identify in different phrases. But the word identify in all of those phrases means exactly the same thing. The only reason those phrases— Is there a claim construction dispute that we're supposed to review de novo here? This is—this is—there are two aspects to it. There is the first question, which is, was Judge White correct in keeping—was he— did he abuse his discretion in keeping Nuance to its ordinary meaning position? And then the second question is, if he was supposed to reopen claims— because this goes back to what Judge Chen, the way we interpreted it, was the same way you did, which was, look, you—they didn't just say plain meaning, like Phillips says, plain meaning. They said, identifying is a simple word that is used every day. So it wasn't just ordinary meaning as it's used in the art of OCR technology. It's ordinary meaning to a layperson. So let's—Judge White said, you cannot go off of that. But then if you say, well, under O2 micro, he did abuse his discretion, so we're going to say he should have reopened Markman, so now we're going to look at that as an error. Then you look at that part of it de novo. But there is nothing in the specification inconsistent. Like I said, the word identify means exactly as Judge White construed it. The only reason it means something different in these phrases is Nuance puts an adjective in front of identifying or it asks about identifying something different. And I think that's what you have to keep in mind when you hear these constant discussions about ambiguous identification because that phrase appears nowhere in the patent. But what about Ms. Maynard's argument that what happened here was a change in the playing field by Abby when, according to Ms. Maynard, everybody understood at a certain point at the Markman stage that identify would encompass ambiguous identification. And then much later in time on the eve of trial, for the first time, Nuance is hearing from Abby that the ordinary meaning of identify does not include ambiguous identification. And now it realizes in a way that it relied on an understanding that Abby had about identify at the Markman level that Abby was now taking away, and that's why we now have an O2 micro problem that needs to be resolved. So first, let me try and take the term ambiguous identification completely out of this case because what she's doing is she's taking an adjective ambiguous and removing it from character which is where it is in our statement where sometimes an identified character can be ambiguous and the patent talks about ambiguous and unambiguous characters. The patent never talks about ambiguous identification in the sense that they need it. She needs to move the adjective from character where it is in the patent to identification. And the reason she has to do that is because character is defined very precisely at A8 and they can't appeal that because they proposed that construction. So they're very cleverly making it. We said sometimes an identified character can be ambiguous and we've never backed away from that in our summary judgment at trial. Sometimes an ambiguous character can be ambiguous in the sense that it shares the same thing. Let me explain why it's not. Because when they take ambiguous from character and move it into identification, all of a sudden they open up this possibility that identifying a character is really just identifying a class to which the character might belong. And that's inconsistent both with the ordinary meaning of identify. It's inconsistent with the construction of character that they convinced the district court to adopt and it's inconsistent with the specification of the patent which says that when you've identified the class to which the character belongs, you need to keep doing feature recognition until you reach the end of the process. Can you translate what your statement was in the Markman? Yes. Explain to me why that's different. Sometimes an identified character can be ambiguous. Meaning sometimes you will identify an S. And it's ambiguous in the sense that you don't know whether it's a capital S or a lower case S. And that's what an ambiguous character is. And you can find the discussions of what an ambiguous character is. That's not the same thing as ambiguous identification in the sense that now we're not sure. Maybe it's a probability. It could be a capital S or a probability it's a lower case S. It is an S. It's that shape. There is a single shape character or a shape code that's output at that point which is it's an S. Now we need to do some further processing whether it's capital S or lower case S. They're talking about something different. What they're trying to do is ambiguous identification all of a sudden becomes what Abby does which is the feature, the thing they accused of feature recognition outputs eight guesses along with probabilities of the correctness of each guess. And so that's when they say ambiguous identification, that's what they're trying to cover. They're not trying to because there's no analog in our system of it's an S and then we go back and see how tall it is compared to the other letters. So that's why it's so important for them to shift the adjective. Now, it strikes me that the real issue here is what do we do with O2 micro when there's an agreement by the parties that the initial claim construction that something has a particular meaning. And then later on if the parties say, well, we understood different things by claiming ordinary meaning, does that mean that the district court under O2 micro has to come back and resolve that dispute instead of saying as the court did here, well, you agreed to this and you're stuck with it and I'm not going to revisit it. Isn't that basically what we're dealing with here? Like I said, if he refused to do anything else and just say, I'm just going to tell the jury. Isn't the question whether when there's an agreed claim construction and it turns out that the difference between the parties as to what that means, whether the district court has to revisit it or whether he can just say, well, too bad you agreed to that and I'm going to give the instruction to the jury even with the ambiguity that may exist in it and you're both stuck with it. So he did further construe. No, no, no, but help me. Yeah, no, he does have to. If the parties come to him with a dispute. Let's assume here that the parties agreed to ordinary meaning and the judge has simply said in the jury instruction, this has a plain and ordinary meaning. Does O2 micro under those circumstances and is it a dispute about the parties on each side says, well, we made a mistake. We need a greater definition. Does O2 micro compel him to revisit the claim construction that the parties agreed to at the original mark? That seems to me is the heart of the question. Yeah, it requires him to resolve the dispute that's in front of him right then and what the dispute that was in front of him right then is what exactly is the ordinary meaning of it. It seems to me you're giving up your case. Yeah, I think your answer is no. So he says ordinary meaning. You convinced me that this term should be given the ordinary meaning and so they get to trial and they say, well, obviously we've got a disagreement on what the ordinary meaning is. So he says, okay, help me resolve that. That's what he's now satisfied with. Does he have to resolve that when the parties said we go with ordinary meaning? Can he say, too bad, you agreed to that and you're stuck with it and that's what I'm going to instruct him to do. Oh, I'm sorry. That's right. That's this court's deference to district courts enforcing the local rules which is we have a schedule for these things to take place and you can't come to me two weeks before trial and all of a sudden ask me to reopen this whole mess that we should have taken care of before there were expert reports, before there were expert reports. The waiver trumps O2 micro. Oh, yes. Oh, yes, yes, it does. I mean, a party, yeah, waiver can trump O2 micro. Really? I mean, if you take O2 micro and you insert the fact that let's assume the parties, which often happens. I mean, you know, people don't recognize. Obviously, they didn't recognize until later on. I think that's what may have happened in O2 micro too. So if the parties come back and try to get it revisited, as Judge Dice referred, it's a waiver, so waiver trumps. Two years ago you agreed it was plain and ordinary, you can't get any refinement to this juncture, even if you are correct, hypothetically, that this refinement that you're disputing now is outcome determinative in terms of a claim construction that will affect infringement? I'm not sure I understand. I mean, if it's a really critical distinction. I mean, plain and ordinary means nothing, and it turns out as the parties get into the case, they realize, well, plain and ordinary means doesn't get it because the refinement is necessary because that refinement to plain and ordinary meaning is going to be what determines infringement or not. If the party that said ordinary meaning originally departs from the plain and ordinary meaning or tries to put some kind of gloss on it, then yes, the district court can reject that argument because that party cannot push a claim construction. It can't change its claim construction in the middle of the case. It's basically the gist. Maybe another way of looking at it is somebody can change their claim construction position later on after a markman if they had good reason to learn about something after the markman that they couldn't have known before, and then once they realize it, they timely and diligently take it to the district court. But under that situation, if the district court said no, maybe that's an abuse of discretion. But if there's a situation where the party was not timely or was unreasonable in discovering a problem late in the game, either or both those situations together, then the district court's well within its discretion to say no, we're not going to be doing this all over again. In the situation you're talking about, the local rules of the northern district do have an avenue for a party to say we've learned new information and we'd like to do this. That wasn't done here. We have a case about that. It doesn't relate to claim construction but to discovery. Pardon me? We have a case about that. We construed the rules of the northern district of California, and we talked about that, something that there has to be a room in the process for later knowledge to reopen. Oh, correct, right. I mean, these rules can't just be, you know, that's the rule and we're done. There is a good cause exception to how the rules go forward. There's nothing else. Establish an identity versus identifying. Are those so similar that maybe even if the district court shouldn't have done that last-minute lurch to a dictionary, it doesn't make a difference because everybody was able to make the arguments that they needed to make in terms of their relative conception of identifying or establish an identity such that the jury was within its reason to come to this conclusion? Yeah, I mean, establish the identity of identified in the patent all means the same thing. I'm glad you asked me that question because nuances counsel keep saying that we said an identification needed to be final, it needed to be unequivocal, and they accused us of arguing to the jury. We never argued to the jury that that claim term meant anything other than as the court construed it. And they provide some citations to the trial record. You'll see if you go to those pages, the expert is talking about the definition of character, and he does talk in one section about the specifications disclosure of an embodiment when there's unequivocal identification, but he never suggests to the jury, never argues to the jury that that embodiment is required by the claims. It's just a discussion of the background of the specification that they twist into some kind of argument that we kept pushing for finality as the end-all and be-all of identification, and there's just no support for that. We only use the district court's definition of identify when we were making our non-infringement defenses. It's a matter of practice when district courts say that for all of these terms, you should just use the ordinary meaning. Does that mean that juries just go in like a black box and do the best they can with those non-construed terms? Are there ever instances where juries say, help, I need a dictionary or something? Or does everybody just say ordinary meaning like it's a grenade and run out of the room? I think in fairness, a lot of plaintiffs do that. But in my experience, most district courts, when there's a dispute, they do their best to try and give the jury more guidance on what the ordinary meaning is, like Judge White did here. You're getting yourself into trouble. What you're suggesting is that despite the agreement at the initial markment as to the meaning of the term, that he had an obligation to reconstrue it later on. I'm not saying he had an obligation to reconstrue it. I'm saying that he provided the jury more guidance on what the ordinary meaning of identifying is, and what he wouldn't allow to happen is nuance. But suppose he's given the jury a definition saying identification means finally identifying. That's the ordinary meaning, and that's what I think. If he had said that? Yeah. I don't think he wouldn't have been able to support that with any kind of... That would be a reversible error, right? It can't just come out of his mind. That would be a reversible error, right? It would, because there'd be no support that that's the ordinary meaning of identifying. No, it's because he changed. He didn't just give them the ordinary meaning. He changed it. In that situation, he would have added an adjective that appears nowhere in the claim. I agree that that would have changed the meaning of the claim, and it certainly wouldn't have been the ordinary meaning of the term. But here, establish the identity of. That's the way people use it. Thank you. This is a rare situation where the parties agreed at claim construction that... I'm not sure it's a rare situation. I think this is a pretty common situation that parties agree to ordinary meaning and then have buyer's remorse later on. And the question is, how do we deal with that? I mean, can the district courts stick them with the agreed claim construction of ordinary meaning when a later dispute erupts? This is a variant of that, just like... It's not that situation. This is a situation where the parties agreed that the ordinary meaning included ambiguous identification. And when Abbey changed its position on that in the summary judgment papers, arguing a different claim construction than that, and then re-disputed it... He didn't get that instruction. That's not what the district court instructed the jury. It's difficult for me to see that he gave an instruction which was inconsistent with ordinary meaning. If he adopted their view that it had to be a final identification, you'd be right. But it doesn't seem to me that he really departed from the ordinary meaning. And the basic question is, are we going to say that O2 micro comes into play even if the parties have agreed to the claim construction earlier and there's been no additional evidence or circumstance which suggests that there's something new? That's precisely what O2 micro holds, Your Honor. O2 micro holds that when a claim construction dispute is presented to the judge... It didn't involve a waiver situation. It involves... This doesn't either, Judge Dike. This is one of the... I assume for me that it does. That the parties have been stipulated. This term should be given to the ordinary meaning. The district court instructs the jury to give it the ordinary meaning and refuses to resolve the later arising claim construction dispute on the ground that there was a waiver by the agreed claim construction of the Markman hearing. Are we supposed to apply O2 micro in those circumstances and say, well, despite the earlier agreement, the judge was obligated to construe the term later on and instruct the jury as to the specific meaning? Yes. Markman said the scope of the claims is a question for the court, not the jury. O2 micro says if that's brought to the attention of the trial court as a claim construction dispute in time to resolve it, he needs to resolve it. And this was raised in plenty of times raised more than five weeks before the trial. It's basically a jury instruction question. And it was... We raised it again. We objected at the jury's conference about it. This is a question of how you tell the jury what the scope and bounds of the claim mean and Markman... But what if there's a situation where one of the parties is unreasonable in coming at a very late date to the district court saying that it now wants a construction on something it didn't want a construction on? I think that would be a situation where there'd be a waiver, right? Even if there's a genuine dispute about the meaning of a claim term or as to what the ordinary meaning is. This isn't that case, Judge Chen. I think that in that situation, the outer bounds would probably be Rule 51, the federal rule of civil procedure with respect to jury instruction, which allow you to bring up jury instruction issues well into the trial in most situations. This was five weeks before the trial. I don't think that's true. I think you said that you can agree at the Markman to a claim construction thing and have a dispute about that and you don't have to raise it again at the time of jury instruction. I mean, there's got to be some room for resolving these things at the Markman so that things don't have to be raised later on. I mean, suppose at the Markman the judge had adopted an agreement by the parties that identified and was finally identified. I mean, you certainly wouldn't be coming in here and contending that later on the parties start disagreeing about that, that they can reopen the claim construction, right? If they disagreed about what finally identified meant? No, no. Yes. No, the patentee says, well, I made a mistake about finally identifying. I don't think that's the right construction. I'm not going to ask you to change it. The district court wouldn't have to change it under those circumstances, right? That's not the case. No, I understand. But you have to answer hypothetically. It would depend on the circumstances. Here, the other side changed their position about what identify means and we raised it at the first possible opportunity. I would have thought that you would have agreed that if there was a specific construction and they wanted to change it, the judge could say waiver it too late. It would depend on the reasons for raising it, I think Judge Dyke. It would depend on the reasons for re-raising it. Here, and can I just, I know we're well over. Yeah, well, we've got just one final thought. Okay, so I would urge the court to look at column 20 because in column 20 and again in column 25, the patent does use identify a character and it includes within identifying a character  Thank you. Thank you. Thank you.